AMERICAN EMPLOYERS' INSURANCE COMPANY & others *vs.* COMMISSIONER OF INSURANCE.

Suffolk. March 5, 1957. — May 3, 1957.

Present: RONAN, SPALDING, WILLIAMS, COUNIHAN, & WHITTEMORE, JJ.

*Insurance,* Rating, Motor vehicle liability insurance, Commissioner of insurance. *Administrative Matter.*

Apart from constitutional questions involved in a proceeding in equity under G. L. (Ter. Ed.) c. 175, § 113B, as amended, for review of an order by the commissioner of insurance fixing premium rates for compulsory motor vehicle liability insurance, the issue is compliance by the commissioner with his statutory duty to fix "adequate, just, [and] reasonable" rates and it is the duty of the court to determine whether his order has reasonable support in the evidence presented to him. [750–751]

At a public hearing held by the commissioner of insurance under G. L. (Ter. Ed.) c. 175, § 113B, as amended, preliminary to fixing premium rates for compulsory motor vehicle liability insurance, there was no error in a denial by him of a motion to strike an opening statement made by him as to fixing the rates from the record on the ground that later in the hearing he refused to become a witness and testify. [751–753]

An order, made by the commissioner of insurance under G. L. (Ter. Ed.) c. 175, § 113B, as amended, after public hearing fixing premium rates for compulsory motor vehicle liability insurance for 1957 by renewing, in substance, the rates for 1956 in disregard of data for recent periods in evidence before him showing an increase in the number and cost of claims which was not offset by any material factors in evidence and which clearly indicated a need for higher rates for 1957 and probable large underwriting loss without them, did not have reasonable support in the evidence and must be annulled as not in compliance with the commissioner's duty under the statute to fix "adequate, just, [and] reasonable" rates. [754, 756]

PETITION, filed in the Supreme Judicial Court for the county of Suffolk on December 5, 1956.

The case was reserved and reported by *Spalding*, J.

*Edmund L. Twomey*, (*Herbert P. Wilkins* with him,) for the petitioners.

*Edward F. Mahony*, Assistant Attorney General, for the respondent.

RONAN, J. This is a petition by all but one of the casualty insurance companies which intend to write compulsory motor vehicle insurance in this Commonwealth during 1957 praying that the compulsory motor vehicle rates established by the commissioner of insurance for the year 1957 be annulled on the ground that such rates do not comply with the standard set by the statute. G. L. (Ter. Ed.) c. 175, § 113B. Besides, eight of the petitioners alleged that the rates established are confiscatory.

The respondent on September 26, 1956, filed in his office a schedule of tentative rates for the year 1957. These rates were the same as the 1956 rates adjusted only to compensate for the elimination of the premium surcharges resulting from the repeal of that portion of the highway safety act, G. L. (Ter. Ed.) c. 90A, which provided for the collection of additional premiums based on the assessment of demerit points against certain owners of motor vehicles. The collectible level of the tentative rates remained the same as they were for 1956. See *Opinion of the Justices*, 334 Mass. 711, 713.

The case was reported and reserved, without decision, by

the single justice on the pleadings, the exhibits introduced before the commissioner, his order of November 21, 1956, fixing the classifications and rates, and a transcript of the oral testimony introduced before him at a public hearing, "such decree to be entered as equity and justice may require."

Eighty-two per cent of the vehicles included in the compulsory insurance group are private passenger vehicles, and it is against the rates upon this class that the attack of the petitioners is mainly directed. In setting rates for 1957 under the statute the commissioner first estimated the pure premium or loss level per automobile which would be incurred during 1957. He then allowed 32.5% of the total premiums for expenses of underwriting, thus leaving 67.5% of the total premiums or charges for the "pure premiums" or losses per automobile to be incurred in 1957. There is really no complaint against this method of computation, but the complaint is that the estimated pure premium or loss level per automobile for 1957 is so low that there will be no such percentage for expenses.

Rate making is not essentially a judicial function. *American Employers' Ins. Co.* v. *Commissioner of Insurance*, 298 Mass. 161, 169. *New England Telephone & Telegraph Co.* v. *Department of Public Utilities*, 327 Mass. 81, 85. *Opinion of the Justices*, 328 Mass. 679, 681. Where the duty is imposed upon a public official by statute to establish a rate that is "adequate, just, [and] reasonable," G. L. (Ter. Ed.) c. 175, § 113B, it is our duty to see that a rate of that description is promulgated by him. We may reëxamine all findings of fact to determine whether they have reasonable support in the evidence. *American Employers' Ins. Co.* v. *Commissioner of Insurance*, 298 Mass. 161. *Insurance Co. of North America* v. *Commissioner of Insurance*, 327 Mass. 745, 753. *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Insurance*, 329 Mass. 265, 273. Where the claim is that the rate established constitutes confiscation or some other infringement of rights guaranteed under the State or Federal Constitution, then the complainant is entitled to our own inde-

pendent judgment as to law and facts. *Lowell Gas Co.* v. *Department of Public Utilities*, 324 Mass. 80, 86–87, and cases cited. *Boston Consolidated Gas Co.* v. *Department of Public Utilities*, 327 Mass. 103, 104–105.

The commissioner is authorized by the statute, G. L. (Ter. Ed.) c. 175, § 113B, to call for such data, statistics, schedules or information of the companies as he may deem necessary to enable him "to fix and . . . maintain fair and reasonable classifications of risks and adequate, just, reasonable and non-discriminatory premium charges . . . ." The petitioners for many years have maintained a voluntary association known as the Massachusetts Automobile Rating and Accident Prevention Bureau, hereinafter called the bureau, for the purpose of supplying him with such data and information. At the public hearing on October 25, 1956, the companies presented schedules, statistics, data and information which had become available since the 1955 hearing. Copies of all of these documents had been forwarded to the commissioner from time to time pursuant to his orders for the reporting of such data and information.

At the opening of the public hearing on October 25, 1956, the commissioner stated that he intended to make no basic change in the compulsory rates for 1957 over the rates for 1956 other than to make the adjustment resulting from the repeal of the demerit surcharge provisions of the highway safety act (G. L. [Ter. Ed.] c. 90A). He said that he had a number of choices for fixing the rate for 1957; that as to each choice he had applied his judgment based upon his knowledge, experience and available facts in determining the amount that would be required by the companies to pay the losses to be incurred in 1957; that the "loss experience reported in the full year 1955 would indicate a rate level close to that which produced rates for 1956, which consisted of the experience of the single year 1954, modified by accident frequency trends indicated in that year and the first few months of 1955"; that there was available to him the latest experience showing the sharp increase in claim costs during the full year 1955 and the first few months of 1956;

that "we are well into a period of abnormalcy first felt in 1954, and which will continue to be felt for a number of years"; and that the rate years of 1954, 1955 and 1956 show the rapid changes under which accident frequency decreased under the highway safety act and increased following its repeal.[1]

The commissioner also stated that an important factor bearing on rates in these abnormal times is the reorganization of the courts, aimed to break up congestion which was mainly due to tort cases arising out of automobile accidents; that he had not entirely ignored the increased accident frequency or the early and possible effects of the reorganization of the courts; that "The advantages of an earlier, and, therefore, less costly disposition of claims in a rising economy can be plainly seen, and the effect of this should financially benefit the purchaser of compulsory insurance in the years to come"; that the problem of a rate maker during this period of abnormal times is to determine whether a rise in accident claim figures indicates an actual rise in accident frequency or a distortion of loss figures; and that the tentative rates might be revised in accordance with the facts submitted at the hearing.

After the commissioner had concluded his statement, the petitioners called an actuary of the division of insurance as a witness to ascertain what part he had in preparing the tentative rates as in previous years, and when it appeared he had no part, counsel for the petitioners called the commissioner as a witness. The commissioner refused to answer any of the score or more of questions put to him by counsel. Thereupon, counsel moved that the commissioner's opening statement be struck from the record.

The motion was properly denied. Administrative hearings are usually conducted by laymen not learned in law, and while all the technicalities of a criminal trial are not necessary all requirements of substantial justice must be complied with. *Sullivan v. Municipal Court of the Roxbury*

---

[1] The surcharge provisions of the act were repealed by St. 1956, c. 51, approved February 8, 1956.

*District*, 322 Mass. 566, 577, and cases cited. Evidence known only to the hearing officer or the board and withheld, or evidence resting entirely upon hearsay, makes the hearing a nullity. *American Employers' Ins. Co.* v. *Commissioner of Insurance*, 298 Mass. 161. *Boott Mills* v. *Board of Conciliation & Arbitration*, 311 Mass. 223. *Sinclair* v. *Director of the Division of Employment Security*, 331 Mass. 101. Here there is no contention that the respondent withheld evidence. On the contrary, the record shows the general elements he had in mind in establishing the rates. The complaint is that the factors he considered had no connection with the rates he fixed. In general a public officer does not become disqualified to act merely because he preferred the charges, or has personal knowledge of them; nor do we think he becomes disqualified because he refuses to become a witness when he is designated by the statute to conduct the hearing and no substitute is named by the statute. See *Moran* v. *School Committee of Littleton*, 317 Mass. 591; *Mayor of Everett* v. *Superior Court*, 324 Mass. 144; *Sharkey* v. *Thurston*, 268 N. Y. 123; *Molloy* v. *Collins*, 66 R. I. 251; *Emerson* v. *Hughes*, 117 Vt. 270.

The companies, however, had furnished the commissioner with various reports showing in great detail the amounts received and the losses incurred in conducting the compulsory motor vehicle insurance branch of their business. He had the figures of the number of claims and their amounts to within a few months of the date of the hearing to establish the 1957 rates. Experience gained up to a few months prior to October 25, 1956, was a better guide for fixing the 1957 rate than prophecy. *Lindheimer* v. *Illinois Bell Telephone Co.* 292 U. S. 151. *West Ohio Gas Co.* v. *Public Utilities Commission of Ohio*, 294 U. S. 79.

There was furnished in monthly instalments by the bureau to the commissioner, as a part of an annual statistical plan requested by him, information which showed all the compulsory insurance issued by each company during the period covered, the place of garaging of the vehicles, and

the claims made and also the claims paid. Complete lists of the losses sustained during the most recent years and also up to March 31 of the rate making year were furnished to the respondent. In the present case the respondent had information which indicated the trends for the last complete year 1955 and showed that for the first seven months of 1956 the average claim cost had increased by 9.1% over the corresponding months of 1955 and the number of claims had increased by 7.3%. The increase in the number of claims and the average payments over the corresponding months of 1955 were circumstances which, unless offsetting factors were shown, indicated need for a higher rate for 1957.

The commissioner stated in his opening that "The advantages of an earlier, and, therefore, less costly disposition of claims in a rising economy can be plainly seen, and the effect of this should financially benefit the purchaser of compulsory insurance in the years to come." This is a mere conclusion reached by the respondent and is unsupported by any evidence. Cases are entered in the Superior Court in some counties where there is less congestion than in others. Some cases are tried in jury waived sessions, others are entered in the Federal courts. Furthermore, it appears in evidence, for instance, that 63.2% of the total losses incurred in the policy year of 1954 were paid on or before December 31, 1955, and that this year in this respect was typical of other years. There was nothing to show that a more prompt disposition would have cost the insurer less. It is possible that the opposite is true.

We are not informed as to what effect, if any, the speeding up of trials in the Superior Court will have in reducing losses of the companies. It is true that the principal cause for congestion in that court is the number of tort cases arising out of automobile accidents. The statement of the commissioner that the speeding up of the court will financially benefit the purchaser of compulsory insurance in the years to come was beside the point. The fixing of rates to become effective within three months was a matter calling for the

immediate attention of the respondent and not rates for some remote period. This observation of the respondent is a mere hope unsupported by any tangible evidence.

The assurance of a prompt jury trial will remove one factor tending to cause settlements. There is no evidence to show that it would be cheaper for an insurance company to settle more cases and to try less. There is another class of cases where, if it is morally certain that a verdict will exceed the compulsory limit, the insurer cannot lose anything by a delay. There was nothing in the commissioner's remarks to show that a greater number would now be disposed of at a lesser cost to the insurer.

The bureau, after what appears to be a careful and detailed study of the statistical and other pertinent information, recommended that the 1957 rates be increased 22% over those for 1956 as to private passenger vehicles. The bureau pointed out that over the six year period (1950–1955) the amounts paid for private passenger automobile losses exceeded by $25,000,000 the amounts included in the rates of the respondent and his predecessor for the payment of these losses.

It was known to the petitioners and the respondent prior to fixing the rates for 1957 that the average loss cost increased from $19.22 per car year in 1948 to $31.71 in 1955. The underwriting loss sustained by the companies for the year 1955 on the evidence in the record can be easily represented as follows:

| | | |
|---|---|---|
| Premiums | | $60,501,912 |
| Losses developed | $45,649,868 | |
| Expenses | $20,028,519 | |
| Losses and expenses | | $65,678,387 |
| | | |
| Underwriting loss | | $ 5,176,475 |

That was the most recent full year that the parties had from which to draw their experience with respect to the preparation of the 1957 rates. All the data, including the most recent reports prior to October 25, 1956, which it was

possible for the bureau to submit to the commissioner, showed that 1956 would prove a worse year than did 1955. If the rates for 1957 are established at the same pure premium or low level cost as the 1956 rates, the petitioners calculate that the full year will result in a loss of approximately $9,000,000. The implications of facts which are of common knowledge point in the same direction. It would seem to follow from the number of automobiles on the highway that the number of accidents would increase and that the amount of the claims would increase also. With rising costs generally, the fees of physicians and surgeons and the charges of hospitals and nurses have increased. Wages have so increased that the loss of wages is now a substantial item in almost every claim for personal injury.

The well directed efforts being made to relieve the congestion in the Superior Court arising out of the trial of tort cases, especially those arising out of automobile accident cases, do not lend reasonable support on this record for the establishment of the rates for 1957. The matter rests in surmise and conjecture. On the other hand, the commissioner has been supplied with pertinent schedules and data, demonstrating the losses being sustained by the companies in writing policies at the rates fixed by the commissioner. He challenged none of the facts submitted by the bureau. He simply declined to grant the increase recommended by the bureau. He ignored the loss of over $5,000,000 incurred in 1955 and a probable loss of $9,000,000 for 1956 and a greater loss during 1957 based on the first six or eight months of 1956. He simply renewed for 1957 the premium charges for 1956. Such rates are not adequate, fair and reasonable and should be annulled.

In view of the conclusion we have reached it is not necessary to consider separately the contentions of those petitioners that allege confiscation although there was evidence that they had sustained substantial losses.

Enough has been said to show that the rates established on November 21, 1956, for private passenger motor vehicles must be annulled and new rates, adequate, fair, reasonable

and nondiscriminatory, based on the evidence already heard on October 25, 1956, must be substituted therefor by the respondent as soon as may be.

*So ordered.*